UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSHUA BOWMAN #677153,

    Petitioner,        Hon. Jane M. Beckering

v.               Case No. 1:21-CV-249

SHANE JACKSON,

    Respondent.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Bowman's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner habeas petitions, the undersigned recommends that Bowman's petition be denied.

## BACKGROUND

As a result of events that occurred on or about June 15, 2016, Petitioner was charged with first-degree felony murder, second degree home invasion, possessing a firearm after being convicted of a felony, and possession of a firearm during the commission of a felony. Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

**Michelle Evans**

Evans is Terrell Baynham's mother.  (ECF No. 8-15, Trial Transcript, May 16, 2017, at 14-15).  On the evening of June 15, 2016, Evans travelled to Baynham's residence with several of her children where she discovered her son "laying on the floor, blood just coming from his ears."  (*Id.* at 15-18).

**Saporaw Cok**

Cok is Terrell Baynham's sister.  (ECF No. 8-15, Trial Transcript, May 16, 2017, at 25).  On the evening of June 15, 2016, Cok travelled to Baynham's residence with her mother, Michelle Evans, and two of her brothers.  (*Id.* at 25-27).  Observing that the door into the residence was "cracked open," one of Cok's brothers entered the residence.  (*Id.* at 27-28).  Upon entering the residence, Baynham's lifeless body was discovered on the floor.  (*Id.* at 28-29).  When asked by the police if her brother had "any problems with anyone," Cok responded that Baynham "had a beef with" Petitioner (a.k.a. Ziggy).  (*Id.* at 30-31).  Cok noticed that Baynham's car, a 2011 or 2012 reddish-orange Camaro, was missing.  (*Id.* at 32-33).  Cok also observed that Baynham's cell phone and television were missing.  (*Id.* at 33).

**Kaila Perkins**

As of June 15, 2016, Perkins had been friends with Terrell Baynham for ten years.  (ECF No. 8-15, Trial Transcript, May 16, 2017, at 39).  At approximately 12:45 a.m. that morning, Perkins drove to Baynham's residence accompanied by her cousin, Makeia Watkins.  (*Id.* at 40).  When Perkins arrived, Baynham was sitting in his car, an orange Camaro, with Petitioner and his friend, Antonio Stevenson, standing

nearby.  (*Id.* at 40-41).  Perkins observed Petitioner's vehicle, a black pickup truck, parked outside Baynham's residence.  (*Id.* at 41-42).

After Perkins and Watkins exited their vehicle, the pair walked "to the end of the block" to discuss their plan for the evening.  (*Id.* at 42-43).  When they returned to Perkins' car, they noticed that Watkins' cell phone, which she left on the roof of Perkins' car, was missing.  (*Id.* at 43-44).  Perkins, having concluded that Petitioner took Watkins' phone, told Baynham that Petitioner "must have tooken her phone. We need to get her phone back, or I'm going to tear up his car."  (*Id.* at 44).  Baynham then briefly spoke with Petitioner after which Watkins' phone was returned.  (*Id.* at 45).

At approximately 1:20 a.m. Perkins and Watkins departed to purchase alcohol. (*Id.* at 46-47).  Perkins told Baynham they would return if Baynham "made those guys leave."  (*Id.* at 47).  Baynham indicated that he "would make that happen."  (*Id.*). When Perkins returned a short time later, however, Petitioner was still standing outside Baynham's residence.  (*Id.* at 47-48).  Baynham entered Perkins' car and told her to "just bend a couple corners.  They'll leave."  (*Id.* at 48).  Perkins agreed and drove around for 15-20 minutes, however, when they returned to Baynham's residence Petitioner and Stevenson were "leaned up against [Petitioner's] pickup truck not going anywhere."  (*Id.*).  Baynham, "surprised that they were still there," told Perkins to "just keep on going."  (*Id.* at 49).  Perkins then drove to her house, which was located approximately thirty minutes away.  (*Id.* at 50).  During this time, the door to Baynham's residence was unlocked.  (*Id.* at 51).

Perkins arrived back at Baynham's residence between 3:30 and 4:00 a.m.  (*Id.* at 51-52).  Perkins did not see Petitioner but noticed that his truck was still parked in the same place as before.  (*Id.* at 52-53).  Perkins asked Baynham to "lock his door and come back with us."  (*Id.* at 53).  Baynham declined and instead asked Perkins to stay at his residence.  (*Id.*).  Perkins declined because she believed that Petitioner and Stevenson "were still there."  (*Id.*).

**Makeia Watkins**

Sometime after 1:00 a.m. on June 15, 2016, Watkins accompanied Kaila Perkins to Terrell Baynham's residence.  (ECF No. 8-15, Trial Transcript, May 16, 2017, at 73-74).  When the pair arrived, Petitioner approached and began talking with Perkins.  (*Id.* at 74-75).  Shortly thereafter, Watkins and Perkins exited the vehicle and "walked to the stop sign."  (*Id.* at 75-76).  When the pair returned, Watkins noticed that her phone was "missing."  (*Id.* at 76).  At this point, Perkins spoke with Baynham who, in turn, spoke with Petitioner, after which Watkins' phone was returned.  (*Id.* at 77).

After her phone was returned, Watkins accompanied Perkins to get alcohol. (*Id.*).  When the pair returned, Petitioner and Antonio Stevenson were still outside Baynham's residence.  (*Id.* at 77-78).  At this point, Baynham got into Perkins' vehicle and the group drove around waiting for Petitioner and Stevenson to depart the area. (*Id.* at 78-80).  The group returned to Baynham's residence at approximately 4:00 a.m.  (*Id.* at 79-80).  Petitioner's truck was still parked in the same location.  (*Id.* at 80-81).  Petitioner and Stevenson, however, were no longer standing outside.  (*Id.* at

79-81).  Baynham's vehicle, a Camaro, was still parked outside.  (*Id.* at 81).  Baynham exited the vehicle and walked toward his residence.  (*Id.*).

**Emunah Evans**

Evans and Baynham knew each other through mutual friends.  (ECF No. 8-15, Trial Transcript, May 16, 2017, at 98).  On or about July 29, 2016, Evans attended a court proceeding in the criminal case against Antonio Stevenson.  (*Id.* at 98-99).  Because "[Petitioner's] name was brought up in the hearing," Evans contacted Petitioner later that day to inquire about the matter.  (*Id.* at 99-101, 106).  Evans relayed to Petitioner what Stevenson testified to earlier that day, in response to which Petitioner stated, "that's not what happened."  (*Id.* at 106-07).  Specifically, Petitioner stated that he did not kill Terrell Baynham.  (*Id.* at 107).  Petitioner continued, providing the following version of events on the night in question.

Petitioner and Stevenson went to Baynham's residence on the night in question to purchase drugs.  (*Id.* at 107-08).  When they arrived, Baynham "was acting like he ain't want them there, didn't want them around."  (*Id.* at 108).  When "two girls" later "pulled up," Baynham got in their vehicle and the group drove away. (*Id.*).  Petitioner and Stevenson waited outside for Baynham to return, but eventually tired of waiting.  (*Id.* at 108-09).  At this point, Petitioner and Stevenson entered Baynham's residence to look for drugs.  (*Id.* at 109).  Petitioner "didn't want to steal nothing" and "was going to leave the money there."  (*Id.*).

Petitioner later "heard someone coming in through the front door, so he went and hid in the bathroom." (*Id.*). Petitioner subsequently "heard some commotion going on in the front room." (*Id.*). Petitioner then exited the bathroom and witnessed Baynham and Stevenson "exchanging words." (*Id.*). Stevenson then "snatched the gun" from Petitioner and shot Baynham twice. (*Id.* at 109-10). Stevenson then began rummaging through Baynham's pockets, taking his keys and cell phone. (*Id.* at 110). Petitioner and Stevenson then exited the residence after which Petitioner gave Baynham's cell phone to somebody sitting outside in a gold Impala. (*Id.* at 110-11). Petitioner then entered his truck and drove away. (*Id.* at 111-12).

**Jon Nae Gladden**

As of June 15, 2016, Gladden was Terrell Baynham's girlfriend. (ECF No. 8-15, Trial Transcript, May 16, 2017, at 119). Sometime that day, Gladden received a telephone call from Baynham's sister after which Gladden travelled to Baynham's residence. (*Id.* at 119-20).

On or about July 7, 2016, Petitioner texted Gladden and instructed her to "stop talking to people." (*Id.* at 121-23). When Gladden asked what this was about, Petitioner warned Gladden that she "got niggas out here speaking on my name" and "mothafuckas saying you keep bringing my name up." (*Id.* at 121-28). Petitioner later texted Gladden, "do people know that I did it?" (*Id.* at 128-29). Gladden responded, "why are people saying that you did it?" (*Id.* at 129). Petitioner responded, "you tell me" and later threatened Gladden by saying, "just know if I go down, you're going down too." (*Id.* at 129-30).

**Dr. Leigh Hlavaty**

As of June 16, 2016, Dr. Hlavaty was employed as the Wayne County Deputy Chief Medical Examiner.  (ECF No. 8-16, Trial Transcript, May 17, 2017, at 17-20). On this date, Dr. Hlavaty performed an autopsy on Terrell Baynham.  (*Id.* at 19-20). This examination revealed an "entrance gunshot wound on the right back of the head" and "another entrance gunshot wound on the side of the left neck."  (*Id.* at 20-22). The bullet which caused the latter injury passed through Baynham's body whereas the bullet causing the former injury was recovered and provided to the Detroit Police Department for analysis.  (*Id.* at 21-23).  The doctor concluded that Baynham's death was a homicide caused by multiple gunshot wounds.  (*Id.* at 24-25).

**Henton Ellis**

Ellis was married to Petitioner's grandmother and had known Petitioner "all his life."  (ECF No. 8-16, Trial Transcript, May 17, 2017, at 28).  On or about June 18, 2016, Ellis spoke with the police.  (*Id.* at 28).  Ellis informed the police that, on June 16, 2016, he observed Petitioner "carrying a television" out of his room.  (*Id.* at 28-31).  Ellis had never before seen this particular television.  (*Id.* at 30). Approximately one month before Ellis spoke with the police, he observed Petitioner with a gun.  (*Id.* at 32-33).  Ellis was unsure specifically what type of gun Petitioner had, but Ellis knew it was not a revolver.  (*Id.* at 33).

**Tina Gillespie**

As of June 15, 2016, Gillespie was employed for the Crime Scene Services of the Detroit Police Department.  (ECF No. 8-16, Trial Transcript, May 17, 2017, at 38).  On this date, Gillespie travelled to Terrell Baynham's residence to "process the crime scene."  (*Id.*).  As part of this process, Gillespie discovered a bullet and a .380 shell casing.  (*Id.* at 41-42).  Gillespie was unable to determine if the bullet was fired from the shell casing, however.  (*Id.* at 42).

**John Leutzinger**

As of June 15, 2016, Leutzinger was employed as an Officer for the Detroit Police Department.  (ECF No. 8-16, Trial Transcript, May 17, 2017, at 55).  On this date, Leutzinger was dispatched to Terrell Baynham's residence to investigate a "possible death."  (*Id.*).  Leutzinger and his partner secured the scene and contacted the "Homicide Section."  (*Id.* at 57-59).

**Mark Burke**

As of June 17, 2016, Burke was employed as a Detective for the Detroit Police Department.  (ECF No. 8-16, Trial Transcript, May 17, 2017, at 62).  On this date, Burke was informed that Petitioner, a homicide suspect, was driving a black Dodge pickup truck.  (*Id.* at 63-65).  With assistance from an undercover unit, Burke was able to locate and stop Petitioner.  (*Id.*).  When asked to identify himself, Petitioner stated that his name was Andrew Bowman.  (*Id.* at 63-64).  Despite knowing that this statement was untrue, Burke was instructed to release Petitioner.  (*Id.* at 64).

**Ki Sobol**

Prior to trial, Petitioner was detained at the Wayne County Jail. (ECF No. 8-16, Trial Transcript, May 17, 2017, at 68). During this time, Sobol was employed by the Wayne County Sheriff's Office to "monitor and run the jail phone system for all three Wayne County Jails." (*Id.*). Sobol played for the jury recordings of three telephone calls Petitioner made while housed at the Wayne County Jail. (*Id.* at 68-71).[1] During these calls, Petitioner denies killing Terrell Baynham but admits he was present when Baynham was killed. (ECF No. 8-19 at PageID.1661, 1668-69).

**Stan Brue**

Beginning in February 2016, Brue was employed as a contractor with the Detroit Police Department conducting "historical analysis of cell phone records." (ECF No. 8-16, Trial Transcript, May 17, 2017, at 73). The trial court qualified Brue to testify as an expert in "the field of forensic analysis of historical call detail reports and cell tower mapping." (*Id.* at 73-77).

Brue analyzed "the interaction. . .between three T-Mobile numbers associated with [Petitioner] and two T-Mobile numbers associated [with] Terrell Baynham" between January 1, 2016, and June 28, 2016. (*Id.* at 78). During this period, Petitioner communicated with Baynham via cell phone on three occasions. (*Id.* at 85). On May 16, 2016, Petitioner initiated a call to Baynham which lasted 7 minutes

---

[1] The record contains the transcripts of the telephone calls in question. (ECF No. 8-19 at PageID.1658-82).

and 50 seconds.  (*Id.* at 85-86).  On May 18, 2016, Petitioner sent two text messages to Baynham.  (*Id.* at 86).

The last outgoing phone call made from Baynham's cell phone occurred on June 15, 2016, at 4:07 a.m. to an unknown number.  (*Id.* at 81).  At 4:09 a.m., Petitioner made an outgoing call from his cell phone.  (*Id.* at 83).  Petitioner's call interacted with a cell tower which was "consistent with" Petitioner being "at or near" Baynham's residence.  (*Id.* at 83-84).  Petitioner did not make another call until 4:38 a.m.  (*Id.* at 84).  At 4:47 a.m., somebody called Baynham's cell phone, but because "the network did not see [Baynham's] phone" the call was routed "directly to voice mail."  (*Id.* at 81-82).

**Michael Crosby**

As of June 15, 2016, Crosby was an Officer with the Detroit Police Department. (ECF No. 8-16, Trial Transcript, May 17, 2017, at 96).  Crosby assisted in the investigation of Terrell Baynham's murder.  (*Id.* at 96-99).  As part of this investigation, Crosby learned that "a car was missing."  (*Id.* at 99).  Because it was equipped with GPS, the police were able to locate and surveil the vehicle.  (*Id.*). Antonio Stevenson was subsequently detained when he attempted to access the vehicle.  (*Id.*).  After speaking with Stevenson, the police began investigating Petitioner's involvement in Baynham's killing.  (*Id.* at 100-01).

Following the presentation of evidence, the jury found Petitioner guilty of first-degree felony murder, second degree home invasion, possessing a firearm after being convicted of a felony, and possession of a firearm during the commission of a felony.

(*Id.* at 84-87).  Petitioner was sentenced to serve life in prison without the possibility of parole on the murder conviction and lesser sentences on his other convictions. (ECF No. 8-18, Sentencing Transcript, June 6, 2017, at 10-11).  Petitioner appealed his convictions in the Michigan Court of Appeals.

The Michigan Court of Appeals affirmed Petitioner's convictions.  *People v. Bowman*, 2019 WL 1645340 (Mich. Ct. App., Apr. 16, 2019).  The Michigan Supreme Court subsequently denied Petitioner's motion for leave to appeal.  *People v. Bowman*, 941 N.W.2d 614 (Mich. 2020).  Petitioner now moves for habeas relief in this Court asserting the following claims:

I.     Ineffective Assistance of Counsel

II.    Prosecutorial Misconduct

III.    Double Jeopardy

IV.    Denial of the Right to a Fair Trial

V.    Denial of the Right to Present a Defense

VI.    Denial of the Right to a Fair Trial

## STANDARD OF REVIEW

Bowman's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)     An application for a writ of habeas corpus on behalf of a person in
custody pursuant to the judgment of a State court shall not be granted
with respect to any claim that was adjudicated on the merits in State
court proceedings unless the adjudication of the claim —

    (1)     resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States, or

    (2)     resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in
the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). As the Supreme Court recently emphasized, this standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation omitted).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). A writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's

application thereof to be *objectively* unreasonable.  *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12.

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308. Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Ibid.*

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy either subsection therein.  This requirement, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 562 U.S. 86, 100 (2011).  Instead, if a state court rejects a federal claim, a federal habeas court "*must presume* that the federal claim was adjudicated on the merits." *Johnson v. Williams*, 568 U.S. 289, 301 (2013).  If this presumption is overcome, however, the Court reviews the matter de novo.  *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

## ANALYSIS

### I.    Double Jeopardy

Plaintiff was initially tried jointly with Antonio Stevenson before separate juries.  (ECF No. 8-4, Trial Transcript, Jan. 19, 2017, at 3).  One of the prosecution witnesses, Detective Derrick Griffin, testified regarding the execution of a search warrant at Petitioner's residence.  (ECF No. 8-8, Trial Transcript, Jan. 24, 2017, at 120-24).  During the Detective's testimony, however, it was revealed that Petitioner was never provided a copy of the search warrant or the search warrant return.  (*Id.* at 135-55).  As a result, Petitioner subsequently agreed, under oath, to entry of a mistrial as to him.  (ECF No. 8-10, Trial Transcript, Jan. 25, 2017, at 31-35).  Petitioner now argues that his subsequent convictions violate his right not to be tried twice for the same offense.

The Double Jeopardy Clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment's Due Process Clause, *Benton v. Maryland*, 395 U.S. 784, 787 (1969), "protects a criminal defendant from repeated prosecutions for the same offense."  *Oregon v. Kennedy*, 456 U.S. 667, 671 (1982).  The Double Jeopardy Clause acts as a check against "the vast power of the sovereign. . .and the injustice our criminal justice system would invite if prosecutors could treat trials as dress rehearsals until they secure the convictions they seek."  *Currier v. Virginia*, 585 U.S. - - -, 138 S.Ct. 2144, 2149 (2018).

This does not automatically preclude the state from subjecting a criminal defendant to a second trial for the same offense, however.  As the Supreme Court has observed, the Double Jeopardy Clause "was not written or originally understood to pose an insuperable obstacle to the administration of justice in cases where there is no semblance of these types of oppressive practices." *Ibid.*  Accordingly, where a criminal defendant moves for, or agrees to, entry of a mistrial, the Double Jeopardy Clause bars a second prosecution only where "the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." *Kennedy*, 456 U.S. at 672-79.

Prior to the commencement of his second trial, Petitioner moved to dismiss the charges against him on Double Jeopardy grounds.  (ECF No. 13-1 at PageID.2191-98).  In his motion, Petitioner offered no new evidence but instead merely argued that the prosecution's failure to produce the search warrant in question was intentional. (*Id.*).  Following a hearing, the trial court denied Petitioner's motion.  Specifically, the court found no evidence of intentional misconduct by the prosecution.  (ECF No. 13-3, Hearing Transcript, Apr. 28, 2017, at 15-16).

The Michigan Court of Appeals rejected Petitioner's double jeopardy claim. *Bowman*, 2019 WL 1645340 at *19-21.  Specifically, the court observed that Petitioner "indicated under oath that he consented to a mistrial and that he understood that he could be retried and that jeopardy would not attach." *Id.* at *19.  With respect to whether the prosecutor intentionally provoked Petitioner into moving for or agreeing to a mistrial, the court found that "[w]hile the prosecutor's negligence with respect to

handling discovery matters is evident from the record, there is nothing in the record that would objectively support an inference that the prosecutor harbored an intent to circumvent the protections of the Double Jeopardy Clause by provoking or goading defense counsel into moving for a mistrial." *Id.* at *21. This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## II.    **Prosecutorial Misconduct**

Petitioner asserts several allegations of prosecutorial misconduct. Specifically, Petitioner alleges that the prosecutor violated his right to a fair trial in the following ways: (1) bolstering the testimony of witnesses during closing argument; (2) arguing facts not in evidence during closing argument; (3) repeatedly violating the court's hearsay order regarding evidence of a non-testifying co-defendant's custodial statement implicating Petitioner; and (4) resorting to a civic duty argument that appealed to the fears of the jurors.

When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor." *Cockream v. Jones*, 382 Fed. Appx. 479, 484 (6th Cir., June 29, 2010) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). The issue is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir.

2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *see also*, *Givens v. Yukins*, 2000 WL 1828484 at *6 (6th Cir., Dec. 5, 2000) ("[t]he aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused") (quoting *Phillips*, 455 U.S. at 219).  Thus, even if the challenged comments were improper, habeas relief is available only where the comments were "so flagrant as to render the entire trial fundamentally unfair." *Gillard*, 445 F.3d at 897.

When assessing whether alleged prosecutorial misconduct warrants relief, the Court undertakes a two-part analysis.  The Court must first determine whether "the prosecutor's conduct and remarks were improper." *Girts v. Yanai*, 501 F.3d 743, 758-59 (6th Cir. 2007).  If such is the case, the Court must then determine "whether the impropriety was flagrant and thus warrants reversal." *Id.* at 759.  When assessing whether an improper comment resulted in a denial of the right to a fair trial, the Court considers the following factors: (1) the likelihood that the comments mislead the jury or prejudiced the accused; (2) whether the comments were extensive or isolated; (3) whether the comments were deliberately or accidentally presented to the jury; and (4) whether the evidence against the accused was substantial. *Id.*

A.      Bolstering Testimony of Witnesses

In his rebuttal closing argument, the prosecutor made reference to Emunah Evans' testimony.  Specifically, the prosecutor noted that Evans testified that Petitioner "was upset over the phone." (ECF No. 8-17; Trial Transcript, May 18, 2017, at 58).  The prosecutor then argued, "why would she tell you that?  It doesn't make

[Petitioner] look bad.  Why did she tell you that?  Because it was true.  She told you exactly what happened, and that truth convicts him of that home invasion, and that truth convicts him of that felony murder."  (*Id.*).  Petitioner argues that characterizing Evans' testimony as truthful constitutes improper bolstering of the witness.  (ECF No. 8-19 at PageID.1864).

Improper bolstering occurs when a prosecutor "implies that the witness's testimony is corroborated by evidence known to the government but not known to the jury."  *Walker v. Morrow*, 458 Fed. Appx. 475, 490 (6th Cir., Feb. 1, 2012).  It is not improper, however, for a prosecutor to argue that a witness should be believed in response to an attack by the defense on that witness' credibility.  *See, e.g., United States v. Boyd*, 640 F.3d 657, 671 (6th Cir. 2011).  Petitioner, in his closing argument, insinuated that Emunah Evans' testimony was not credible.  (ECF No. 8-17; Trial Transcript, May 18, 2017, at 44-46).  In his rebuttal, the prosecutor did not argue, or even insinuate, that there existed evidence, unknown to the jury, which corroborated Evans' testimony.  Rather, the prosecutor merely argued that Evans was credible.

The Michigan Court of Appeals rejected this claim on the ground that the prosecutor's comments did not deprive Petitioner of the right to a fair trial.  *Bowman*, 2019 WL 1645340 at *19.  This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the

evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

B.    Mischaracterizing Evidence and Arguing Facts not in Evidence

In his rebuttal argument, the prosecutor made the following comments:

> And who came out of the home after the murder?  Who came out of the home with the phone?  Was it Stevenson?  No.  The defendant, Mr. Baynham's phone, he got it out of the pocket.

(ECF No. 8-17; Trial Transcript, May 18, 2017, at 60).

Petitioner argues that, based on these comments, "[t]he prosecutor mischaracterized testimony and argued facts not in evidence. . ."  (ECF No. 8-19 at PageID.1864).

In response to the challenged comments, Petitioner immediately objected. (ECF No. 8-17; Trial Transcript, May 18, 2017, at 60).  The trial court overruled the objection observing that "[i]t's up to the jury to determine what the testimony was." (*Id.*).  The relevant testimony revealed the following.

Emunah Evans testified regarding the comments Petitioner made to her during a conversation on or about July 29, 2016.  According to Evans, Petitioner stated the following.  Antonio Stevenson shot and killed Terrell Baynham after which Stevenson "started going through [Baynham's] pockets and took out his cell phone and his keys."  (ECF No. 8-15; Trial Transcript, May 16, 2017, at 110).  Petitioner and Stevenson then exited Baynham's residence.  (*Id.* at 110-11).  Once outside, Petitioner

gave the cell phone to somebody in a "gold Impala." (*Id.* at 111).  Petitioner did not

tell Evans how or when he took possession of the cell phone.  (*Id.*).

> In rejecting this claim, the Michigan Court of Appeals observed:

> While it appears that the prosecutor's statement conflicted with Evans's testimony about what the defendant had said about who removed the cell phone from Baynham's pocket, the prosecutor's statement that defendant had Baynham's cell phone when defendant left the house was consistent with Evans's testimony.  It seems that the prosecutor incorrectly recalled the substance of the testimony in this relatively minor respect.

*Bowman*, 2019 WL 1645340 at \*18.

The Michigan Court of Appeals rejected this claim on the ground that even if

the prosecutor's statement was improper, "any potential prejudicial effect was

extinguished by [the trial court's] curative instruction, and defendant has not shown

that he was denied a fair and impartial trial as a result of this remark." *Ibid.*  This

decision is neither contrary to, nor involves an unreasonable application of, clearly

established federal law.   Furthermore, this decision was not based on an

unreasonable determination of the facts in light of the evidence presented.

Accordingly, this claim raises no issue upon which habeas relief may be granted.

C.    Violating Court's Hearsay Order

Petitioner next argues that "[t]he prosecutor repeatedly violated the court's

hearsay order regarding the evidence of a non-testifying co-defendant's custodial

statement implicating [Petitioner] during examination and closing argument, as

noted above." (ECF No. 8-19 at PageID.1865).  While unartfully stated, Petitioner

asserts that his rights were violated when statements by Antonio Stevenson, the co-defendant in his first trial, were admitted against him.  In support of this claim, Petitioner references testimony by two witnesses as well as a statement made by the prosecutor in his rebuttal closing argument.

As noted above, Emunah Evans testified that, on or about July 29, 2016, she attended a court proceeding in the criminal case against Antonio Stevenson.  (ECF No. 8-15, Trial Transcript, May 16, 2017, at 99-100).  Evans further testified that because "[Petitioner's] name was brought up in the hearing," she contacted Petitioner to discuss the matter.  (*Id.* at 99-101, 106).  Specifically, Evans testified, "I told [Petitioner] I went to the preliminary hearing, and that Antonio Stevenson had said that he was[. . .]" (*Id.* at 101).  Before Evans could complete her thought, however, Petitioner objected to testimony, on hearsay grounds, as "to what Antonion Stevenson said."  (*Id.*).  The trial court then discussed the matter outside the jury's presence.  (*Id.* at 101-04).  The court ruled that Evans "cannot say what she heard at the preliminary exam and what Stevenson said.  She can say I relayed information to [Petitioner] about what happened at the preliminary exam, but she cannot say specifically what was said at the preliminary exam."  (*Id.* at 104-05).  Evans then resumed her testimony and complied with the court's ruling.  (*Id.* at 106-17).

Officer Michael Crosby testified that after speaking with Antonio Stevenson, Petitioner became a suspect in Terrell Baynham's murder.  (ECF No. 8-16; Trial Transcript, May 17, 2017, at 100).  Petitioner objected on hearsay grounds, but the

21

objection was overruled.  (*Id.*).  The trial court ruled that so long as Crosby did not

indicate what Stevenson stated, it was acceptable for Crosby to testify what he did

after hearing Steveson's statements.  (*Id.*).

In his rebuttal closing argument, the prosecutor made the following comments

which Petitioner argues violated "the spirit of the trial court's ruling":

> They knew who these people were the day after.  Stevenson was caught
> in the car.  Stevenson talked.  They did a line-up.  The Defendant,
> Bowman, was picked out of the lineup.  They knew who these people
> were.  They just needed some more time to develop a case.

(ECF No. 8-17; Trial Transcript, May 18, 2017, at 62).

As the Michigan Court of Appeals observed, "no evidence was admitted at trial

of the substance of any statement allegedly made by Stevenson."  *Bowman*, 2019 WL

1645340 at *18.  This conclusion is consistent with the testimony alluded to above.

Likewise, the brief comment by the prosecutor, quoted above, did not reveal the

substance of any statement by Stevenson.  Thus, the Court fails to discern the basis

for Petitioner's argument that the prosecutor "repeatedly violated" the trial court's

ruling precluding the introduction of testimony as to out-of-court statements by

Antonio Stevenson.

The Michigan Court of Appeals rejected this claim on the ground that the

challenged testimony and statements did not deprive Petitioner of the right to a fair

trial.  *Bowman*, 2019 WL 1645340 at *18.  This decision is neither contrary to, nor

involves an unreasonable application of, clearly established federal law.

Furthermore, this decision was not based on an unreasonable determination of the

22

facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

        D.     Civic Duty Argument

Petitioner argues that his right to a fair trial was violated when the prosecutor "resorted to a civic duty argument that appealed to the fears of jurors when he talked about 'partners in crime' 'getting away' with felony murder three times because they merely pointed the finger at each other."  (ECF No. 8-19 at PageID.1865).

In his closing argument, the prosecutor at one point told the jury, "I want to talk to you about aiding and abetting, which I mentioned a couple of times."  (ECF 8-17; Trial Transcript, May 18, 2017, at 28).  In an attempt to explain the concept of aiding and abetting, the prosecutor described a hypothetical scenario in which a pair of individuals commit a series of crimes.  (*Id.* at 29).  In this hypothetical scenario, the pair commit a series of home invasions during which one of them kills an occupant in the residence.  (*Id.* at 29).  The police have evidence that the pair committed the crimes but are unable to determine which of the pair committed the murder because the pair "just point the finger at each other and say, well, he did it, and he says he did it."  (*Id.*).  Because the police are unable to determine which of the pair committed the murder, neither of the pair can be charged or convicted of the killing.  (*Id.*).  The prosecutor argued that this result was "absurd" and would result in "anarchy."  (*Id.* at 30).  The prosecutor noted that to address the situation described in his hypothetical scenario, society developed the law of aiding and abetting.  (*Id.*).  The

23

prosecutor then advised the jury that the trial judge would instruct them on the law of aiding and abetting, which was the law that they were obligated to follow.  (*Id.*).

It is not improper for a prosecutor to encourage a jury to "act as the community conscience." *Harris v. McKee*, 2014 WL 12972128 at *2 (6th Cir., Sept. 30, 2014). Likewise, "nothing prevents the government from appealing to the jurors' sense of justice." *United States v. Hall*, 979 F.3d 1107, 1122 (6th Cir. 2020).  It is when a prosecutor goes further, however, and makes arguments "calculated to incite the passions and prejudices of the jurors" or invites the jury to convict "based on their fear for community safety" that a violation of the right to a fair trial occurs. *Ibid.*  For example, a prosecutor "may not urge jurors to identify individually with the victims" or "fan the flames of the jurors' fears by predicting that if they do not convict, a crime wave or some other calamity will consume their community." *Ibid.*

The remarks challenged here do not come close to crossing this line, however. The prosecutor, through the use of a benign hypothetical, attempted to describe for the jury the rationale underlying the concept of aiding and abetting.  The prosecutor then expressly stated to the jury that the judge would instruct them on the law regarding aiding and abetting which they were obligated to follow.  The Michigan Court of Appeals rejected this claim. *Bowman*, 2019 WL 1645340 at *19.  This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.    Furthermore, this decision was not based on an

24

unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## III.    Right to Present a Defense

Mildred Brown testified at Petitioner's first criminal trial.  (ECF No. 8-9; Trial Transcript, Jan. 25, 2017, at 19-39).  After the conclusion of the State's case-in-chief in Petitioner's second trial, Petitioner moved the trial court to have Brown's previous testimony read into the record due to her alleged unavailability.  (ECF No. 8-17; Trial Transcript, May 18, 2017, at 3-4).  Petitioner declined the court's offer to have Brown picked up by the police on a "witness detainer."  (*Id.* at 5).  The court denied Petitioner's motion on the ground that Petitioner had failed to establish that he exercised due diligence in attempting to locate Brown.  (*Id.* at 6).  Because of this failure, Petitioner could not demonstrate that Brown was "unavailable."  (*Id.*). Accordingly, his motion was denied.  Petitioner argues that the trial court's decision to not read Mildred Brown's prior testimony into the record deprived him of the right to present a defense.

The United States Constitution guarantees to criminal defendants "a meaningful opportunity to present a complete defense." *United States v. Geisen*, 612 F.3d 471, 495 (6th Cir. 2010) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). This right is not without limits, however, and may be reasonably restricted "to accommodate other legitimate interests in the criminal trial process." *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *see also*, *Taylor v. Illinois*, 484 U.S. 400, 412-13

(1988) ("[t]he Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system"); *Couturier v. Vasbinder*, 385 Fed. Appx. 509, 516 (6th Cir., July 13, 2010) ("the right to present a complete defense is not an unlimited right to ride roughshod over reasonable evidentiary restrictions") (citation omitted).  As the Supreme Court has recognized, "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes v. South Carolina*, 547 U.S. 319, 326-27 (2006); *see also*, *Geisen*, 612 F.3d at 495; *United States v. Armstrong*, 2011 WL 3792363 at \*4 (6th Cir., Aug. 26, 2011).

Accordingly, criminal defendants "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Wynne v. Renico*, 606 F.3d 867, 870 (6th Cir. 2010) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)).  The application of such rules does not abridge an accused's right to present a defense so long as they are not "arbitrary or disproportionate to the purposes they are designed to serve." *Renico*, 606 F.3d at 870 (quoting *Scheffer*, 523 U.S. at 308).  As is well recognized, trial judges must make many evidentiary rulings during the course of a trial and "the Constitution leaves to the judges who must make these decisions wide latitude to exclude evidence that is repetitive, only marginally relevant or poses an undue risk of harassment, prejudice, or confusion of the issues." *Crane*, 476 U.S. at 689-90.

26

An evidentiary ruling violates a defendant's right to present a defense only where "the exclusion of evidence seriously undermined fundamental elements of the defendant's defense against the crime charged." *Miskel v. Karnes*, 397 F.3d 446, 455 (6th Cir. 2005) (quoting *Scheffer*, 523 U.S. at 315-17). Accordingly, whether the exclusion of the evidence in question violated the defendant's right to present a defense "depends upon whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that otherwise did not exist." *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006).

At Petitioner's initial trial, Mildred Brown testified as follows. Terrell Baynham's house was located "behind" Brown's house "on another street." (ECF 8-9; Trial Transcript, Jan. 25, 2017, at 29-30). At approximately 2:30 a.m. on the morning of June 16, 2016, Brown exited her house with her son. (*Id.* at 24). Brown "stood outside about five minutes talking to [her] son." (*Id.* at 31). During this time, Brown observed "about seven or eight" people standing "in the front" of Baynham's residence. (*Id.* at 24). Brown could not identify any of the people she observed. (*Id.* at 28). Brown could not even discern whether Baynham was among this group or even whether the people were male or female. (*Id.* at 24, 28). The people Brown observed were not causing a disturbance or otherwise acting suspiciously but were instead "drinking and laughing." (*Id.* at 24-25). Brown also conceded that she neither observed nor had knowledge of what occurred at Baynham's residence later that morning. (*Id.* at 31-32).

27

This testimony is hardly sufficient to have created a reasonable doubt as to Petitioner's guilt that did not otherwise already exist.  To the contrary, Brown's testimony does not call into question or refute the evidence supporting Petitioner's guilt.  Petitioner also finds significant Brown's testimony regarding her security system.  A review of this testimony, however, reveals that it completely fails to advance Petitioner's position.

Brown testified that she had security cameras "on [her] house" which created recordings of the events within their field of view.  (*Id.* at 21, 35).  Brown spoke with the police the same day Baynham was killed.  (*Id.* at 28).  Brown, however, refused to allow the police to review the recordings from her security system.  (*Id.* at 32).  Likewise, Brown never reviewed the security footage from the morning in question.  (*Id.* at 37).  Brown further conceded that her cameras could not even observe the front of Baynham's residence.  (*Id.* at 36).

Simply put, the decision by the trial court not to allow Mildred Brown's prior testimony to be read into the record was not unreasonable as Petitioner had failed to demonstrate that Brown was unavailable to testify in person.  Moreover, it is not reasonable to argue that the failure to admit Brown's prior testimony in any way prejudiced Plaintiff's ability to defend the charges against him.  The Michigan Court of Appeals rejected this claim.  *Bowman*, 2019 WL 1645340 at *21.  This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable

determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

## IV.    Judge's Comment to the Jury

At the conclusion of the prosecutor's case-in-chief, the trial judge stated to the jury:

> We moved quicker today than we anticipated.  And so one of the defense witnesses is not available until tomorrow morning.  And so we are not going to be able to proceed until tomorrow morning.  So we're going to send you home a little early.  You can enjoy this warm, humid weather that I hear we have out there.  I haven't seen it today since I came in early this morning.  But enjoy the rest of your afternoon, and we'll see you at 9 o'clock tomorrow morning.  And we're real close to wrapping up the case.  So we'll hear from defense witnesses in the morning and probably have you deliberating by afternoon.

(ECF No. 8-16; Trial Transcript, May 17, 2017, at 111).

Petitioner argues that the judge's comments violated his right to a fair trial because it "led the jury to believe that the defense would put on a case."  (ECF No. 8-19 at PageID.1877-78).  The precise nature of Petitioner's claim is unclear because, as the Michigan Court of Appeals noted, Petitioner failed to identify any legal authority supporting his argument.  *Bowman*, 2019 WL 1645340 at *22.  Petitioner has likewise presented no authority to this Court supporting this claim.

The Fourteenth Amendment to the United States Constitution guarantees to every criminal defendant the right to a "fair trial in a fair tribunal before a judge with no actual bias against the defendant."  *Lyell v. Renico*, 470 F.3d 1177, 1186 (6th Cir. 2006) (quoting *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997)).  To the extent

Petitioner is alleging judicial bias, he must demonstrate that the trial judge exhibited conduct "so extreme as to display clear inability to render fair judgment." *Lyell*, 470 F.3d at 1186-87 (quoting *Liteky v. United States*, 510 U.S. 540, 551 (1994)).

Petitioner did, in fact, intend to present evidence from at least one witness, Mildred Brown, as discussed above.  Moreover, as the Michigan Court of Appeals observed, from the conversation that occurred when Petitioner moved to have Brown's prior testimony read into the record, it appears that the trial judge was aware, before making the challenged comments, that Petitioner intended to call Brown to testify.  *Bowman*, 2019 WL 1645340 at *22.  Thus, it is not reasonable to interpret the trial judge's brief comment as exhibiting a clear inability to render fair judgment.  The trial judge made reference to a defense witness being unavailable. Considering that Petitioner was present and available, it is likewise not reasonable to interpret the trial judge's comment as referring to Petitioner or suggesting that Petitioner would testify.

The Michigan Court of Appeals rejected this claim.  *Bowman*, 2019 WL 1645340 at *22.  This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

30

**V.    Judge's Ruling During Prosecutor's Closing Argument**

As discussed above, Petitioner alleged that the prosecutor committed misconduct when he allegedly mischaracterized Emunah Evans' testimony regarding the circumstances under which Petitioner possessed Terrell Baynham's cell phone following his murder.  As noted, the trial judge overruled Petitioner's objection on the ground that "[i]t's up to the jury to determine what the testimony was."  (ECF No. 8-17; Trial Transcript, May 18, 2017, at 60).  Petitioner now separately argues that the trial judge's failure to uphold his objection violated his right to a fair trial.

Petitioner has failed to identify any authority supporting this claim which is not surprising because, absent a circumstance in which a criminal defendant waives the right to a jury trial, it is, in fact, the jury's duty to determine the facts in a criminal prosecution.  *See, e.g., United States v. Martin*, 704 F.2d 267, 272-73 (6th Cir. 1983) (recognizing that absent a valid waiver of the right to trial by jury, it is the jury's role to determine the facts in criminal cases).  Petitioner did not waive his right to jury trial in this matter.  Accordingly, this claim is without merit.

The Michigan Court of Appeals rejected this claim.  *Bowman*, 2019 WL 1645340 at *17-18.  This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

31

## VI.    Ineffective Assistance of Counsel

Petitioner argues that he is entitled to relief on the ground that his trial attorney was ineffective thereby depriving him of the right to a fair trial.  Specifically, Petitioner alleges that his attorney was ineffective in the following ways: (1) failing to object to hearsay testimony; (2) failing to move for certain evidence to be stricken from the record; (3) failing to secure the appearance of a witness; (4) conceding, in his closing argument, an element of the felony murder charge; (5) failing to object to the admission of improper character evidence; (6) failing to move that certain portions of his jail telephone calls not be played for the jury; (7) failing to adequately cross-examine the prosecution's cell phone records expert; and (8) failing to object to highly irrelevant testimony.

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom.  *See Premo v. Moore*, 562 U.S. 115, 121 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).  To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness."  *Premo*, 562 U.S. at 121 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).  A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance."  *Premo*, 562 U.S. at 121 (quoting *Strickland*, 466 U.S. at 689).  Petitioner's burden is to show that "counsel made errors so serious that [he] was not

32

functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Premo*, 562 U.S. at 121-22 (quoting *Strickland*, 466 U.S. at 687).

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance.  Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Premo*, 562 U.S. at 122 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).  The issue is whether counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."  *Premo*, 562 U.S. at 122 (quoting *Strickland*, 466 U.S. at 690).  This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory."  *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

As the Supreme Court has made clear, even when reviewing an ineffective assistance of counsel claim *de novo*, "the standard for judging counsel's representation is a most deferential one."  *Premo*, 562 U.S. at 122.  Likewise, the standard by which petitions for habeas relief are judged is "highly deferential."  Thus, when reviewing, in the context of a habeas petition, whether a state court unreasonably applied the *Strickland* standard, review is "doubly" deferential.  *Ibid.* (citations omitted).  As the *Premo* Court concluded:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating reasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* at 122-23 (internal citations omitted).

A.    Failure to Object to Hearsay Testimony

Petitioner has identified several instances in which his attorney failed to object to allegedly hearsay testimony.

1.    Saporaw Cox

Petitioner argues that his attorney improperly failed to object when Cox testified that Terrell Baynham told her that he had "some problems" with Petitioner. (ECF No. 8-15; Trial Transcript, May 16, 2017, at 30-31).  Cox also testified, however, from personal knowledge that she was aware of the problems between Petitioner and Baynham.  (*Id.* at 31).  Thus, as the Michigan Court of Appeals observed, "even a successful hearsay objection would have served no practical purpose because the jury would still have learned about the existence of tension between Baynham and [Petitioner], which demonstrates the cumulative nature of the challenged testimony." *Bowman*, 2019 WL 1645340 at *10.

The Michigan Court of Appeals rejected this claim, concluding that "it was a reasonable strategic decision under the circumstances for counsel to decline to raise an objection, and [Petitioner] has not shown a reasonable probability that the

outcome would have been different but for the admission of this testimony." *Ibid.* This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

2.    Kaila Perkins

As noted above, prior to his murder, Terrell Baynham rode around with Kaila Perkins and Makeia Watkins waiting for Petitioner and others to depart the area. Perkins testified that while the trio was riding around, Baynham stated that he "had left his main door open" and "wasn't prepared to just leave." (*Id.* at 51). Petitioner faults his attorney for failing to object to this testimony.

In his closing argument, however, Petitioner relied on this testimony. Specifically, Petitioner argued that he could not have been guilty of home invasion, and by extension could not have been guilty of felony murder, because he had permission to enter Terrell Baynham's residence in his absence. (ECF No. 8-17; Trial Transcript, May 18, 2017, at 43-44). In support of this theory, Petitioner relied on Perkins' testimony that Baynham stated that he departed without securing his residence. (*Id.*).

The Michigan Court of Appeals rejected this claim noting that Petitioner's theory at trial "was supported, not undercut, by Perkins's contested testimony." *Bowman*, 2019 WL 1645340 at *10. As the court further observed, Petitioner failed

35

to overcome the presumption that his attorney's failure to object to the testimony in question was "sound trial strategy" and likewise failed to demonstrate that he was prejudiced by the introduction of the testimony in question. *Ibid*. This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

3.    Detective Mark Burke

Detective Burke testified that he effected a traffic stop on Petitioner, on June 17, 2016, because he "received information that [Petitioner] was a homicide suspect." (ECF No. 8-16; Trial Transcript, May 17, 2017, at 65). Petitioner faults his attorney for failing to object to this testimony.

The question that elicited the challenged testimony was posed by the jury via written question. Specifically, the question posed by the jury to Detective Burke was "why was the black truck stopped by the police?" (*Id.*). As the Michigan Court of Appeals observed, "[t]here was no indication from the phrasing of the question that it would necessarily elicit hearsay, so defense counsel had no reason to object before the question was asked." *Bowman*, 2019 WL 1645340 at *11. As the court further observed, counsel "may have also determined that it was better to refrain from objecting [to] such a brief and relatively inconsequential answer at that point, rather than drawing further attention to it." *Ibid*.

The Michigan Court of Appeals rejecting this claim on the ground that Petitioner failed to "overcome the presumption that counsel's performance constituted sound trial strategy" or that he "was prejudiced by the information that [he], at some point, had been considered by the police to be a homicide suspect." *Ibid.* As the court further observed, the jury "was instructed that the fact that [Petitioner] was charged with a crime and was on trial is not evidence" and jurors "are presumed to follow their instructions." *Ibid.* The decision by the Michigan Court of Appeals rejecting this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

4.    Detective Michael Crosby

Detective Crosby testified that, after speaking with Antonio Stevenson, Petitioner became a suspect. (*Id.* at 100-01). Petitioner faults his attorney for failing to object to this testimony. Specifically, Petitioner argues that his attorney should have objected to this testimony on hearsay grounds. The shortcoming in Petitioner's argument, however, is that the testimony in question was not hearsay. Accordingly, this claim raises no issue upon which habeas relief may be granted.

37

B.    Failure to Move to Strike Evidence

Petitioner argues that his attorney "never asked once for evidence ruled inadmissible to be stricken from the record."   (ECF No. 8-19 at PageID.1850). Petitioner insinuates that there existed numerous items of "inadmissible" evidence that were admitted into evidence because his counsel failed to object, but the only item of evidence to which Petitioner cites in his argument is "[Antonio] Stevenson's statement."   (*Id.*).   As discussed above, Petitioner's counsel successfully objected to the introduction of any out-of-court statement by Antonio Stevenson.   Thus, as the Michigan Court of Appeals observed:

> [A]ny references to statements by Stevenson were brief and vague.  Trial counsel could have reasonably determined that further emphasis on those statements by seeking to have the jury specifically instructed not to consider them would have only served to highlight their potentially damaging nature.  It can be an effective trial strategy to refrain from objecting under such circumstances.  Moreover, to the extent that it could be inferred that Stevenson stated that [Petitioner] was present and involved in the crimes, there was significant additional evidence supporting such an inference, making any reference to a statement by Stevenson to that effect cumulative.

*Bowman*, 2019 WL 1645340 at *9.

Accordingly, the Michigan Court of Appeals rejected this claim on the ground that Petitioner "has not overcome the strong presumption that trial counsel employed sound trial strategy or shown that he suffered prejudice."   *Ibid.*   This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.   Furthermore, this decision was not based on an unreasonable

determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

C.    Failure to Secure Witness Testimony

Petitioner sought to question Mildred Brown at his second trial.  As previously discussed, however, Brown failed to appear and Petitioner's motion to read Brown's prior testimony into the record was denied because Petitioner failed to establish that Brown was unavailable.   Petitioner now argues that it constituted deficient performance for his trial attorney to fail to secure Brown's appearance at his second trial.  Petitioner's claim fails for two reasons.

First, Petitioner has presented no evidence suggesting what testimony Brown would have offered had she testified at Petitioner's second trial.  By failing to present such evidence, Petitioner cannot possibly show this his attorney's failure to secure Brown's testimony prejudiced his defense.  Second, to the extent Petitioner faults his attorney for failing to get Brown's prior testimony read into the record, as discussed above, Brown's prior testimony did not advance Petitioner's cause.  As the Michigan Court of Appeals observed, Brown's prior testimony "would not have been material or had any impact on the determination of the issues that were central to the case." *Bowman*, 2019 WL 1645340 at *12.  Thus, Petitioner cannot show that he was prejudiced by his attorney's failure to persuade the trial court to read Brown's prior testimony into the record.

The Michigan Court of Appeals rejected this claim. *Id.* at *11-12. This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

D.    Conceding an Element of the Felony Murder Charge

In addition to two firearms-related charges, Petitioner was charged with second-degree home invasion and felony murder. Petitioner argues that his attorney rendered deficient performance by conceding in his closing argument that he and Antonio Stevenson entered Terrell Baynham's residence to look for drugs without also noting that "he and Stevenson. . .were going to leave money for them." (ECF No. 8-19 at PageID.1853).

The elements of felony murder are: (1) the defendant caused the death of a human being;[2] (2) with the intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result; (3) while committing, attempting to commit, or assisting in the commission of an enumerated felony. *People v. Traviss*, 2018 WL 5304933 at *1 (Mich. Ct. App., Oct. 25, 2018). Second-degree home invasion is one of the felonies

---

2 This element does not require Petitioner to have been the "sole cause" of Terrell Baynham's death. *People v. Traviss*, 2018 WL 5304933 at *2 (Mich. Ct. App., Oct. 25, 2018). Rather, it is sufficient that Petitioner "be a contributory cause that was a substantial factor in producing the harm." *Ibid.*

expressly enumerated in the Michigan felony murder statute.  *See* Mich. Comp. Laws § 750.316(1)(b).  The elements of second-degree home invasion are (1) the entering of a dwelling by breaking or without permission; (2) done with the intent to commit a felony, larceny, or assault in the dwelling.  *People v. Sutherland*, 2014 WL 2753706 at *1 (Mich. Ct. App., June 17, 2014).

In his closing argument, Petitioner's attorney argued that Petitioner did not commit a home invasion because he and Antonio Stevenson had permission to enter Terrell Baynham's residence.  (ECF No. 8-17; Trial Transcript, May 18, 2017, at 42-44, 54-55).  Counsel further argued that because Petitioner did not commit a home invasion he could not be convicted of felony murder.  (*Id*.).  As counsel noted, this argument was supported by several items of evidence: (1) the lack of evidence that Petitioner or Stevenson had been asked to leave the area; (2) the lack of evidence that the door to Baynham's residence was locked on the morning in question; and (3) the evidence that Baynham stated that he departed with Kaila Perkins without first securing his residence.  (*Id*. at 43).

This appears to be a reasonable argument supported by the evidence. Nonetheless, Petitioner faults his attorney for conceding, during the course of this argument, that Petitioner entered Baynham's residence to look for drugs without further noting that Petitioner was "going to leave money for them."  According to Petitioner, this argument would have negated any argument that he entered

Baynham's residence to commit larceny and thus would have precluded finding him guilty of home invasion or felony murder.

Petitioner's argument disregards the fact that home invasion is not simply premised on entering a dwelling to commit larceny.  As noted above, one of the elements of second-degree home invasion is that the person enter the dwelling with the intent to commit a felony, larceny, or assault in the dwelling.  Petitioner has identified no authority indicating that an individual avoids criminal liability for drug-related offenses merely by presenting evidence that he paid for the drugs.  Thus, while arguing that Petitioner intended to "leave money" for the drugs he was looking for may have negated a charge of larceny, it hardly negates the possibility that Petitioner was committing a felony.  Thus, counsel's alleged failure lacks the significance Petitioner asserts.

Granted, counsel's concession that Petitioner entered Baynham's residence for the purpose of looking for drugs arguably constitutes a "concession" of one of the elements of the offense of home invasion.  Considering, however, that Petitioner himself admitted to Emunah Evans that he was in Baynham's residence and that he entered the residence to look for drugs, it hardly seems deficient for counsel to have acknowledged such.  Had counsel failed to acknowledge such, the prosecutor could easily have argued that Petitioner entered the residence with far more sinister intent than to simply purchase (or even steal) drugs.

At the end of the day, Petitioner's argument boils down to a disagreement over strategy.  Counsel made the strategic choice to argue that Petitioner could not have committed home invasion because he did not enter Baynham's residence without permission.  This argument is legally sound and was supported by multiple items of evidence.  Petitioner's argument that he intended to pay for any drugs he took from Baynham's residence, assuming the jury even believed such, does not necessarily advance Petitioner's cause.  Moreover, as is well recognized, it constitutes reasonable strategy for an attorney to "candidly acknowledge[e] the strength of the prosecutor's case" and in so doing "impress the jury with his candor and his unwillingness to engage in a useless charade." *French v. Burt*, 2021 WL 5018808 at *11 (W.D. Mich., Apr. 5, 2021).

The Michigan Court of Appeals rejected this claim on the ground that counsel's strategy with respect to this particular argument was "sound." *Bowman*, 2019 WL 1645340 at *13.  This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

E.    Failing to Object to Improper Character Evidence

As noted above, shortly after Kaila Perkins and Makeia Watkins initially arrived at Terrell Baynham's residence, Watkins' cell phone was discovered missing. Perkins testified that Petitioner "must have tooken [Watkins'] phone." Petitioner argues that his attorney should have objected to this testimony as it improperly suggested that he "was a thief and was at the scene of the crime in order to steal other things." (ECF No. 8-19 at PageID.1858).

As the Michigan Court of Appeals observed, however, "defense counsel actually used the evidence of this cell phone incident to the advantage of the defense." *Bowman*, 2019 WL 1645340 at *13. Specifically, counsel argued that Perkins simply assumed that it was Petitioner who had taken Watkins' phone, despite having no evidence to support her conclusion. (ECF No. 8-17; Trial Transcript, May 18, 2017, at 40-43). As counsel further observed, Perkins was intoxicated and unreasonably angry over the situation. (*Id.*). Counsel, in short, attempted to discredit Perkins and demonstrate that she was not a credible witness and may have possessed motive to testify untruthfully regarding Petitioner. Again, Petitioner merely disagrees, after the fact, with the strategy employed by his attorney.

The Michigan Court of Appeals rejected claim on the ground that Petitioner offered nothing to overcome the "strong presumption" that counsel's performance in this regard constituted sound strategy. *Bowman*, 2019 WL 1645340 at *14. This decision is neither contrary to, nor involves an unreasonable application of, clearly

44

established federal law.    Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

F.      Failing to Move to Suppress Portions of Petitioner's Jail Telephone Calls

As previously noted, the prosecution played for the jury recordings of telephone calls Petitioner placed while he was incarcerated.  In one of these calls, Petitioner called a woman who, when Petitioner called, was apparently in her vehicle in the process of ordering food at a Wendy's drive-thru.  (ECF No. 8-19 at PageID.1663-70). During this telephone call, the woman used profanity and threatened to "whip" or "beat" her children if they did not stop misbehaving.  (*Id.*).  Petitioner argues that listening to this telephone call "must have been very offensive to the jury and must have made them think very poorly of [Petitioner] that he was close to someone who would speak to children in such a way, not to mention threaten to beat them."  (ECF No. 8-19 at PageID.1859-60).  Petitioner faults his attorney for failing to request that the offensive portions of this telephone call be redacted.

The Michigan Court of Appeals rejected this claim on the following ground:

> Assuming without deciding that defense counsel could have successfully moved to have the jail calls redacted to prevent the jury from hearing these statements, we are convinced based on our review of the recordings that it is not reasonable to believe that the jury's decision to convict defendant of the serious crimes at issue in this case, which include felony-murder and second-degree home invasion, on the basis of these statements made by an unknown individual or by defendant's use of profanity. Defendant has not shown that there exists

45

a reasonable probability, which would affect our confidence in the outcome, that the result of the trial would have been different if the jail calls had been redacted.

*Bowman*, 2019 WL 1645340 at *15.

This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

G.    Failing to Adequately Cross-Examine a Prosecution Witness

As previously noted, Stan Brue testified for the prosecution as an expert in the field of forensic analysis of historical call detail reports and cell tower mapping. Petitioner argues that he is entitled to relief because his attorney failed to adequately cross-examine this witness.  (ECF No. 8-19 at PageID.1860-62).

Petitioner posits a variety of questions which he asserts his attorney should have asked Brue.  (*Id.*).  As the Michigan Court of Appeals correctly observed, however, Petitioner "has not provided any indication that such questions would have elicited testimony helpful to the defense.  Instead, [Petitioner] constructs an argument for why he believes his trial counsel should have asked these questions that is based on purely speculative assumptions of fact that are unsupported by *any* record evidence."  *Bowman*, 2019 WL 1645340 at *15.

46

Accordingly, the Michigan Court of Appeals rejected this claim on the ground that Petitioner had failed to establish either prong of the *Strickland* analysis.  *Id.* at *15-16.  This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

H.    Failing to Object to Irrelevant Testimony

When he testified, Detective Crosby spoke about the investigation into Terrell Baynham's murder.  Specifically, Crosby testified that a gun Antonio Stevenson had in his possession when he was arrested was not the murder weapon.  (ECF No. 8-16; Trial Transcript, May 17, 2017, at 100).  Crosby also testified that, after speaking with Stevenson, Petitioner became a suspect in the killing of Terrell Baynham.  (*Id.* at 100-01).  Crosby testified that as part of the investigation into Petitioner, certain Facebook accounts were examined.  (*Id.* at 101).  Crosby testified that as part of his investigation, "some surveillance [was] done on [Petitioner]."  (*Id.* at 101-02).  Finally, Crosby testified that "there were some family members who came forward with information that helped us with the case, gave us some statements."  (*Id.* at 102).  Petitioner argues that, because this testimony was "irrelevant" and "highly prejudicial," his counsel was ineffective for failing to object to this testimony.  (ECF No. 8-19 at PageID.1862).

The Michigan Court of Appeals rejected this claim on the following ground:

> Assuming without deciding that defense counsel could have successfully prevented any of this challenged evidence from coming in at trial by making a timely objection, defendant simply asserts on appeal that this evidence "prejudiced" defendant. The testimony cited by defendant involved brief, vague statements by Crosby involving Stevenson's arrest, locating phone numbers for defendant, surveillance conducted on defendant, and the fact that Stevenson and defendant's family members made statements. The substance of these statements was not repeated by Crosby. In light of all of the trial evidence, including defendant's own detailed statements implicating himself in the crimes, defendant has not demonstrated that there exists a reasonable probability that the trial outcome would have been different but for the admission of this testimony.

*Bowman*, 2019 WL 1645340 at *16.  This decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States.  Accordingly, the undersigned recommends that Bowman's petition for writ of habeas corpus be denied.  The undersigned further recommends that a certificate of appealability be denied.  *See Slack v. McDaniel*, 529 U.S. 473 (2000); *Miller-El*, 537 U.S. at 336.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: February 1, 2024                    /s/ Phillip J. Green
                                          PHILLIP J. GREEN
                                          United States Magistrate Judge